# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Jennifer Baker, as a representative of a class of similarly situated persons, and on behalf of the Incentive-Investment Plan for John Hancock Employees,<br><br>                              Plaintiff,<br>v.<br><br>John Hancock Life Insurance Company (U.S.A.),<br><br>                              Defendant. | Case No.<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiff Jennifer Baker, as a representative of the Class described herein, and on behalf of the Incentive-Investment Plan for John Hancock Employees (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendant John Hancock Life Insurance Company (U.S.A.) ("John Hancock" or "Defendant"). As described herein, Defendant breached its fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by applying an imprudent and inappropriate preference for John Hancock products within the Plan, despite their poor performance, high costs, and lack of traction among fiduciaries of similarly-sized plans. In addition, Defendant failed to monitor or control the Plan's administrative expenses, costing the Plan millions of dollars in excessive administrative fees over the course of the class period. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of September 2019, Americans had approximately $8.5 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $30.1 Trillion in Third Quarter 2019* (Dec. 18, 2019), *available at* https://www.ici.org/research/stats/retirement/ret_19_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee.

4.      For financial service companies like John Hancock, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, using proprietary investment products that a non-conflicted and objective fiduciary would not choose.

5.      To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)); *see also Glass Dimensions, Inc. v. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (same). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.      Defendant has not acted in the best interest of the Plan and its participants. Instead, Defendant used the Plan – one of the largest 401(k) plans in the country – to promote John Hancock's proprietary financial products and earn profits for John Hancock. Throughout the class period, Defendant has offered only John Hancock investment products within the Plan. Defendant failed to objectively evaluate the Plan's options in an unbiased manner or consider whether participants would be better served by other investment alternatives in the marketplace. This has resulted in tens of millions of dollars in lost investment returns to the Plan and its participants since the start of the class period in 2014.

7.      At the same time, Defendant failed to prudently and loyally monitor the Plan's administrative expenses, and instead allowed the Plan to pay over three times what a prudent and loyal fiduciary would have paid for such services. These excessive administrative payments,

made in the form of "revenue sharing" payments coming directly from the investment fees charged to the Plan for investing in John Hancock mutual funds, resulted in millions of dollars in additional losses to the Plan and its participants during the class period.

8.      Based on this conduct, Plaintiff asserts a claim against Defendant for breaches of the fiduciary duties of loyalty and prudence. In connection with this claim, Plaintiff seeks to recover all losses to the Plan resulting from Defendant's fiduciary breaches, all profits earned by John Hancock in connection with its fiduciary breaches or the Plan's assets, and other appropriate relief.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendant may be found.

## THE PARTIES

### PLAINTIFF

12.     Plaintiff Jennifer Baker resides in Rochester, New Hampshire, and was a participant in the Plan from 2014 until 2019. As a Plan participant, Plaintiff Baker was invested in multiple investment options managed by John Hancock's subsidiaries, and she has been financially injured by the unlawful conduct described herein. Plaintiff Baker's account would have been worth more at the time it was distributed from the Plan had Defendant not violated ERISA as described herein.

### THE PLAN

13.     The Plan was established by John Hancock on January 1, 1988. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

14.     The Plan covers eligible employees and former employees of John Hancock and participating affiliates. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan. John Hancock matches employee contributions up to 4% of their eligible compensation.

15.     The Plan is a very large plan in the defined contribution plan marketplace. Since 2015, the Plan has had between $1.4 billion and $1.8 billion in assets and between 9,100 and 9,800 participants, and has consistently ranked in the top half of the 99th percentile of all defined contribution plans by size.[1]

---

[1] At the end of 2016, there were approximately 656,000 defined contribution plans. Only 2,621 had more than 5,000 participants, and only 725 had more than $1 billion in assets. U.S. DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Dec. 2018), *available at*

16.     The Plan uses a group annuity structure in which Plan participants may direct their accounts to one or more investment options selected by the Plan's fiduciaries. As of the end of 2014, these investment options under the Plan consisted entirely of proprietary investment products affiliated with John Hancock: 43 John Hancock actively-managed funds, four John Hancock passive index funds, a suite of John Hancock target date funds, a suite of John Hancock target risk funds, and a guaranteed interest account branded as the John Hancock Fixed Income fund.[2] Indeed, the Plan consisted entirely of John Hancock proprietary investment products throughout the statutory period.

## DEFENDANT

17.     Defendant John Hancock Life Insurance Company (U.S.A.) is a financial services company headquartered in Boston, Massachusetts. Defendant is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Defendant exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

18.     John Hancock is specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the Department of Labor. Defendant's status as Plan Administrator also renders it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

19.     To the extent that Defendant has delegated any of its fiduciary functions to others,

---

https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2016.pdf.
[2] John Hancock hires other investment managers to subadvise several of these funds, while John Hancock manages the assets itself in several other funds. But John Hancock earns a significant portion of the fees in all of these funds, even those where the investment decisions are made by other managers.

it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Norton Co. v. John Hancock Mut. Life Ins. Co.*, 1992 WL 237410, at *6 (D. Mass. Sept. 14, 1992); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

## ERISA FIDUCIARY DUTIES

20.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
> > (i)      providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

21.     These ERISA fiduciary duties are "the highest known to the law." *Braden*, 588 F.3d at 598 (quoting *Bierwirth*, 680 F.2d at 272 n.8); *see also Glass Dimensions*, 931 F. Supp. 2d at 304 (same).

## DUTY OF LOYALTY

22.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

23.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F.

Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).[3]

24.     ERISA also requires fiduciaries to limit administrative expenses. 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … *and defraying reasonable expenses of administering the plan*[.]"). A fiduciary may breach this duty by authorizing higher-than-market recordkeeping fees or maintaining a recordkeeping deal for its own benefit. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming judgment against plan sponsor based on "overpaying" recordkeeper and benefiting from the overpayment); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## DEFENDANT'S VIOLATIONS OF ERISA

### I.   DEFENDANT'S PROCESS FOR SELECTING AND MONITORING INVESTMENT OPTIONS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST.

25.     Defendant's process for selecting and monitoring the Plan's investment options was disloyal and imprudent. Instead of considering the full range of investment options in the marketplace and objectively evaluating the Plan's investments against marketplace alternatives, John Hancock only considered its own proprietary investments for the Plan and failed to conduct any meaningful review of the investments that were included in the Plan lineup.

26.     As noted above, the Plan has offered only John Hancock investments products since at least 2014. Although using proprietary options is not a breach of the duty of prudence or

---

[3] It is no defense to the imprudence of some investments that others may have been prudent; "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically…create[d] a prudent portfolio." *Bunch*, 532 F. Supp. 2d at 289 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

loyalty in and of itself, a plan fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments.

***Target-Risk Funds***

27.     The Plan's five target risk funds offer a good example of Defendant's imprudent and self-interested process for managing the Plan's investments. The Plan's menu included all five of John Hancock's target-risk funds (Multimanager Lifestyle Balanced, Conservative, Moderate, Growth and Aggressive) throughout the class period,[4] and for most of that period, the John Hancock Multimanager Lifestyle Balanced Fund was the default fund for participants who did not elect an investment. As of year-end 2018, the Plan had more than $105 million invested in the John Hancock Multimanager Lifestyle Balanced Fund, and had over $295 million invested in the target-risk funds in total.

28.     Based on a review of publicly-filed Form 5500s from the 2017 and 2018 plan years for plans with over $500 million in assets, Plaintiff is not aware of any defined contribution plan other than the Plan that offered John Hancock's target-risk funds (Multimanager Lifestyle Balanced, Conservative, Moderate, Growth or Aggressive) during that time period.

29.     The fiduciaries of other large defined contributions did not utilize these John Hancock target-risk funds for good reason. As of the end of 2019, all five target-risk funds materially trailed their custom benchmarks—which were designed by John Hancock itself and

---

[4] Each of the target risk funds consisted of a portfolio of stock, bond, and alternative investments in proportions that match the fund's risk level. Each target-risk fund uses a fund-of-funds structure, meaning that this mix was achieved by investing in a portfolio of different mutual funds (generally between 35 and 50 funds), almost all of which were affiliated with John Hancock.

used to measure performance in the target-risk funds' prospectuses[5]—over the prior 3- and 5-

year periods,[6] with benchmark underperformance averaging 1.33% and 1.22% *per year* across

the five funds over the prior 3- and 5-year periods respectively.[7] This underperformance occurred

despite the fact that the target risk funds were taking on *more* risk than their custom

benchmarks.[8]

30.     This underperformance is also reflected in earlier data. For example, as of the end

of 2014, the target risk funds underperformed their benchmarks by an average of 0.52% per year

over the prior 3 years and 0.66% per year over the prior 5 years, while their risk-adjusted

performance was even worse, with average alpha of -0.66% per year over the prior three years,

and -1.34% per year over the prior five years.

31.     A prudent and objective review of comparable investments in the marketplace

---

[5] *See, e.g.*, John Hancock Funds Prospectus dated August 31, 2015, *available at* https://www.sec.gov/Archives/edgar/data/1331971/000114544315001240/d294531.htm (last accessed Feb. 24, 2020).

[6] In analyzing performance history (along with other characteristics), prudent fiduciaries generally pay particular attention to longer time periods, including 3- and 5-year historical performance.

[7] All performance data regarding the Plan's investments is from Morningstar Direct, a widely used database of investment returns. Returns reflect the performance of the publicly-traded, underlying mutual funds held by the Plan, but do not account for additional fees charged by the Plan or fee credits refunded to Plan participants. As of the end of 2019, the target-risk funds in the Plan were receiving fee credits of approximately 0.40% per year. If these Plan credits were made throughout the subject period (a fact that is unknown to Plaintiff as of the filing of the Complaint), performance would have been 0.40% better per year than discussed in paragraphs 29 through 32, as would risk-adjusted performance (alpha). However, even including these fee credits, the funds underperformed. Moreover, the fee credit amounts were not uniform across all Plan options. For example, the target-date funds were receiving fee credits of between 0.09% and 0.13% as of the end of 2019, and thus the performance of the target-date funds would have been between 0.09% and 0.13% better than shown in paragraphs 34 through 36 if those fee credits were in fact provided.

[8] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. As of the end of 2019, the Balanced Fund had an alpha of -1.39% and -1.28% *per year* against its custom benchmark over the prior 3- and 5-year periods respectively, meaning that on a risk-adjusted basis, the Balanced Fund underperformed its self-selected benchmark by 1.28% per year between 2015 and 2019. The alpha for all five target-risk funds was negative during this five-year period, averaging  -1.23% per year.

would have revealed numerous available investments that were superior to the John Hancock target-risk funds that Defendant retained in the Plan. As an example, the following chart shows the performance of the Balanced target-risk fund as of the end of 2014 compared to four other investments in the marketplace that had (1) similar asset allocations and levels of risk,[9] (2) comparable or lower expenses, (3) greater acceptance among fiduciaries of similar plans:

| Fund Name | Ticker | 3-Yr Return (as of 12/31/14) | 5-Year Return (as of 12/31/14) | Current Expense Ratio | # of Plans > $500M in Fund (12/31/18)[10] |
|---|---|---|---|---|---|
| JH Multimanager Balanced | JILBX | 11.41% | 8.99% | 0.56%[11] | 1 (the Plan) |
| American Funds American Balanced | RLBGX | 15.18% | 12.53% | 0.28% | 58 |
| Fidelity Puritan | FPUKX | 15.02% | 11.85% | 0.45% | 87 |
| Vanguard Balanced Index | VBIAX | 13.14% | 11.34% | 0.07% | 71 |
| Vanguard Wellington | VWENX | 14.03% | 11.35% | 0.17% | 191 |

32.     Superior alternatives also existed for each of the other target-risk funds in the Plan (the Conservative, Moderate, Growth and Aggressive funds). The fact that Defendant used its own target-risk funds in spite of these superior alternatives supports an inference that its process for selecting and monitoring the Plan's investments was self-interested and imprudent. *See* DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3; Restatement (Third) of Trusts § 90, cmt. d ("The trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and

---

[9] Morningstar has created a taxonomy of mutual funds that divides mutual funds into 64 different categories, with categorization determined by historical analysis of the underlying holdings of each fund. All five funds in the chart were placed by Morningstar in the US Fund Allocation— 50% to 70% Equity category.

[10] Plan data from years prior to 2018 was not available to Plaintiff as of the time of the filing of the Complaint.

[11] Reflects a fee credit to Plan participants of roughly 0.40% per year. Expense data from prior years is not displayed because Plaintiff is not in possession of data about the amount of fee credits, if any, refunded in years prior to 2019.

reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining relevant information about … the nature and characteristics of **available investment alternatives**.") (emphasis added).[12]

**Target-Date Funds**

33.     Another good example of Defendant's flawed investment management process is the suite of proprietary target-date funds ("TDFs") that Defendant maintained in the Plan.[13] Based on a review of publicly filed Form 5500s from the 2017 and 2018 plan years for plans with over $500 million in assets, Plaintiff is not aware of any defined contribution plan other than the Plan that offered John Hancock's Multimanager Lifetime TDFs during that time period. Nonetheless, Defendant included these funds in the Plan, and reaped significant investment management fees in connection with the Plan's investment in these funds.

34.     The TDFs, like the target risk funds, have been poor investments for Plan participants. For example, as of the end of 2019, the John Hancock Multimanager 2040 Lifetime Portfolio underperformed its custom benchmark (which was designed by John Hancock and used in the fund's prospectus) by 1.43% per year in the prior 3-year period and 1.15% per year in the

---

[12] *Accord Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017) (evidence of disloyalty includes "not considering other possible" investments); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 636 (D.N.J. 2010) ("Whether an investment decision could have been the result of prudent investing depends on the ***alternatives available*** to the fiduciary to accomplish the same purpose, in light of all the other relevant information about the investments.") (emphasis added); *Davidson v Cook*, 567 F. Supp. 225, 236 (E.D. Va. 1983) ("The fiduciaries did not … compare [the loan investment] to other ***available investments***, but instead did their best to accommodate the [sponsor's] needs.") (emphasis added).

[13] A target date fund invests in a diversified mix of asset classes managed towards a particular target retirement date. For example, the John Hancock Multimanager 2040 Lifetime Fund is designed for an investor who expects to retire around 2040. As the target date approaches, the investment mix becomes more conservative, typically by shifting away from equity investments towards more conservative fixed income investments. The Plan held eleven different John Hancock TDFs in the Plan as of the end of 2018, starting with the 2010 vintage and ending with the 2060 vintage of TDF, with each vintage separated by 5 years (i.e. 2010, 2015, 2020, etc.).

prior 5-year period.[14] The other John Hancock TDFs (which all use the same underlying funds but in different percentages) in the Plan had similarly poor performance, as one would expect given that they had the same managers and used the same underlying funds (but in different percentages) as the 2040 fund. For example, as of the end of 2019 the John Hancock Multimanager 2030 Lifetime Portfolio had underperformed its self-selected, custom benchmark by 1.22% and 0.98% per year over the prior 3- and 5-year periods, respectively. This underperformance was not the result of a more conservative investment approach, as demonstrated by the TDFs' negative risk-adjusted performance over each time period.[15]

35.     This underperformance is also reflected in earlier data. For example, as of the end of 2014, the John Hancock 2030 Fund had underperformed its custom, self-selected benchmark by 0.98% and 1.09% per year over the prior 3- and 5-year periods respectively, while the 2040 fund had underperformed its benchmark by 1.62% and 1.34% per year during the same periods.

36.     A prudent and objective review of comparable investments in the marketplace would have revealed other TDFs that were superior to the John Hancock target-date funds that Defendant retained in the Plan. As an example, the following chart shows the performance of the 2040 TDF as of the end of 2014 compared to four other investments in the marketplace that had

---

[14] The custom benchmark for each target-date fund has changed over time as the target date has drawn closer and the fund's investment mix has become more conservative. Benchmark performance for all years was measured by using the 2019 version of the custom benchmarks found in the funds' 2019 prospectus. The funds' relative performance vis-à-vis their benchmarks would have been worse had prior versions of the benchmark been used.

[15] As of the end of 2019, the John Hancock 2030 Fund had an alpha of -1.03% and -1.10% *per year* against its 2019 custom benchmark over the prior 3- and 5-year periods respectively, while the 2040 Fund had an alpha of -1.23% and -0.97% per year against its 2019 custom benchmark over the prior 3-and 5-year periods. Using the 2014 version of each fund's benchmark to measure alpha yields similar results, with 3- and 5-year alphas of -0.82% and -0.89% for the 2030 Fund and -1.18% and -0.93% for the 2040 vintage.

(1) similar asset allocations and levels of risk,[16] (2) comparable or lower expenses, (3) greater

acceptance among fiduciaries of similar plans:

| Fund Name | Ticker | 3-Yr Return (as of 12/31/14) | 5-Year Return (as of 12/31/14) | Current Expense Ratio | # of Plans > $500M in Fund (12/31/18)[17] |
|---|---|---|---|---|---|
| JH Multimanager 2040 Lifetime | JLIOX | 14.81% | 10.75% | 0.50%[18] | 1 (the Plan) |
| American Funds 2040 Target Date Retire | RFGTX | 16.44% | 11.79% | 0.38% | 26 |
| T. Rowe Price Retirement 2040 | TRPDX | 16.27% | 12.06% | 0.58% | 78[19] |
| TIAA-CREF Lifecycle 2040 | TLZIX | 15.02% | 11.85% | 0.45% | 67 |
| Vanguard Target Retirement 2040 | VBIAX | 15.48% | 11.57% | 0.14% | 130[20] |

37.    Superior alternatives also existed for each of the other John Hancock TDFs, and

the ongoing retention of the John Hancock TDFs in the Plan further reflects a fiduciary process

imprudently and disloyally tilted in John Hancock's favor.

**Other Failing Funds**

38.    Defendant also kept the Plan invested in proprietary funds that were failing in the

marketplace, leaving Plan participants as some of the very last investors propping up the funds.

For example, in June 2019, John Hancock announced the liquidation of six of its proprietary

funds in the marketplace because continuation of those funds was "not in the best interests of the

---

[16] All five funds in the chart were placed by Morningstar in the US Fund Target-Date 2040 category.

[17] Plan data from years prior to 2018 was not available to Plaintiff as of the time of the filing of the Complaint.

[18] Reflects a fee credit to Plan participants of roughly 0.13% per year. Expense data from prior years is not displayed because Plaintiff is not in possession of data about the amount of fee credits, if any, refunded in years prior to 2019.

[19] An additional 33 plans with over $500 million in assets are invested in the collective trust version of the T. Rowe Price Retirement 2040 Fund.

[20] An additional 306 plans with over $500 million in assets are invested in the collective trust version of the Vanguard Target Retirement 2040 Fund.

fund or its shareholders as a result of factors or events adversely affecting the fund's ability to conduct its business and operations in an economically viable manner."[21] In other words, the funds had failed to attract sufficient investment in the marketplace to be economically viable.

39.     Of the six funds that John Hancock announced it would liquidate in June 2019, five were still in the Plan as of December 31, 2018.[22] The Plan's investment in each of these funds represented a substantial percentage of total fund assets.

40.     For example, when its liquidation was announced, the John Hancock Fundamental Large Cap Value Fund had approximately $87.6 million in assets under management. As of December 31, 2018, the Plan had approximately $14.4 million invested in the fund. Thus, the Plan's investment represented over 16% of the total assets under management.

41.     Another liquidated fund, the John Hancock International Growth Stock Fund, had approximately $60.5 million in assets under management when it was closed to the market in June 2019. As of December 31, 2018, the Plan had approximately $6.1 invested in that fund, meaning the Plan owned approximately 10% of the fund.

42.     As of December 31, 2018, the Plan also had millions of dollars invested in each of the three other failing funds that John Hancock closed to the marketplace in June 2019.

43.     These were not the only investments that Defendant retained in the Plan long after they had failed in the wider marketplace. In June 2018, John Hancock announced that it would be liquidating the John Hancock Natural Resources Fund. As of June 2018, the fund was badly

---

[21] CITYWIRE, *John Hancock cuts subadvisors, liquidates raft of funds* (June 27, 2019), *available at* https://citywireusa.com/professional-buyer/news/john-hancock-cuts-subadvisors-liquidates-raft-of-funds/a1245101.

[22] Because most of the evidence regarding the Plan's investment history is in Defendant's exclusive possession, Plaintiff does not know exactly when these funds were removed from the Plan. However, at least three were in the Plan as of June 2019, when John Hancock announced to the public at large that they would be liquidated.

underperforming a custom index and its Morningstar peer group. The fund had an average annual return of 2.67% over the trailing 3-year period versus 4.13% for its custom index and 5.49% for its peer group, and -2.46% over the trailing 5-year period versus 1.95% for its custom index and 3.59% for its peer group. That is, the John Hancock Natural Resources fund was chronically underperforming even on a pre-fee basis. Yet, Defendant retained this poorly performing fund in the Plan through at least December 31, 2017, at which point the Plan had over $10 million invested in the fund.

44.     Defendant's imprudent retention of underperforming proprietary funds was not limited to funds that have been liquidated. For example, since 2013 the Plan has had between $60 and $80 million in assets invested in the John Hancock Equity Income Fund, which invests in domestic large company value stocks. 2019 marked the eighth calendar year out of the past ten in which the Equity Income Fund underperformed its benchmark index, the Russell 1000 Value Index. Yet Defendant continued to retain this chronically underperforming fund. This underperformance was reflected in earlier data. As of the end of 2014, for example, the John Hancock Equity Income Fund had underperformed its benchmark by 2.89% and 1.98% *per year* over the prior 3- and 5-year periods. A prudent and objective review of comparable investments in the marketplace would have revealed other large-cap value options that were superior to the John Hancock Equity Income Fund that Defendant retained in the Plan. As an example, the following chart shows the performance of the John Hancock Equity Income Fund as of the end of 2014 compared to four other investments in the marketplace that had (1) similar asset allocations and levels of risk,[23] (2) comparable or lower expenses, and (3) greater acceptance among fiduciaries of similar plans:

---

[23] All five funds in the chart were placed by Morningstar in the US Fund Large Value category.

| Fund Name | Ticker | 3-Yr Return (as of 12/31/14) | 5-Year Return (as of 12/31/14) | Current Expense Ratio | # of Plans > $500M in Fund (12/31/18)[24] |
|---|---|---|---|---|---|
| JHVIT Equity Income | n/a[25] | 18.00% | 13.44% | 0.39%[26] | 1 (the Plan) |
| Dodge & Cox Stock | DODGX | 23.71% | 15.56% | 0.52% | 204 |
| MFS Value | MEIKX | 20.60% | 14.35% | 0.47% | 105 |
| Vanguard Value Indx | VVIAX | 20.15% | 14.96% | 0.05% | 100 |
| Vanguard Windsor II | VWNAX | 19.34% | 14.10% | 0.26% | 165 |

45.     The retention of these and other funds that had failed in the wider marketplace reflects a fiduciary process imprudently and disloyally tilted in John Hancock's favor.

46.     Fiduciaries of other large plans (with assets in excess of $500 million) largely rejected the John Hancock products that Defendant selected for the Plan, and no other fiduciary of a similarly-sized plan invested exclusively in John Hancock's products.

47.     Indeed, investors have been fleeing John Hancock's products in the larger marketplace. Since 2016, John Hancock has experienced net negative outflows of billions of dollars per year, with its industry market share dropping from 1.04% in 2015 to 0.79% in 2019, and cumulative net outflows of approximately $27 billion dollars during that time.

48.     Though asset management companies such as John Hancock tend to favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016).

---

[24] Plan data from years prior to 2018 was not available to Plaintiff as of the time of the filing of the Complaint.

[25] The underlying mutual fund is sold only through insurance products and therefore does not have a ticker. *See* JHVIT Form N-1A Registration Statement dated April 25, 2019, available at https://www.sec.gov/Archives/edgar/data/756913/000113322819002411/jhvit-html1026_485bpos.htm

[26] Reflects a fee credit to Plan participants as of the end of 2019 of approximately 0.34% per year. Expense data from prior years is not displayed because Plaintiff is not in possession of data about the amount of fee credits, if any, refunded in years prior to 2019.

18

Further, this poor performance tends to persist, empirically demonstrating that "the decision to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808–10. A study of third-party administrators such as John Hancock similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

49.     Given the poor track record of John Hancock's funds, their struggles in the marketplace, and their lack of utilization among fiduciaries of other large plans, it was imprudent to retain these funds in the Plan, and certainly imprudent to maintain a plan menu consisting ***exclusively*** of these funds.  Defendant improperly retained these funds to serve its own business interests, not participants' interests, and generate additional investment fee income for John Hancock.

## II.     DEFENDANT FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S RECORDKEEPING EXPENSES.

50.     In addition to the foregoing failures with respect to the Plans' investment program, Defendant failed to properly monitor and control the Plan's recordkeeping expenses.

51.     Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price. Between 2006 and 2016, recordkeeping costs in the marketplace have dropped by approximately 50% on a per-participant basis.

52.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. However, Defendant failed to leverage the Plan's size and allowed the Plan to pay recordkeeping fees that were substantially higher than the market rate for other similar plans.

53.    The Plan's recordkeeping expenses are paid through the investments in the Plan via a process known as "revenue sharing." Specifically, every investment in the Plan includes a built-in "administrative fee" of 0.1% that is used to pay for the Plan's recordkeeping expenses. Because these revenue sharing payments come out of the investment management fees that participants are paying within each Plan investment, participants bear the financial burden of these revenue sharing payments.

54.    While revenue sharing can be a legitimate means of paying for recordkeeping expenses, it is important for retirement plan fiduciaries to closely monitor the amount of revenue sharing payments that are made to ensure that the plan's recordkeeper is not receiving excessive compensation.  However, Defendant failed to do so consistent with its fiduciary obligations.

55.    As of year-end 2018, the Plan had over $1.6 billion invested in John Hancock funds, resulting in total recordkeeping payments of approximately $1.6 million. The Plan had 9,807 participants at this time, meaning that recordkeeping expenses amounted to $163 per participant per year. Based on Plaintiff's investigation, a prudent and loyal fiduciary of a similarly sized plan could have obtained comparable recordkeeping services for approximately $50 per participant at that time. It was not prudent or in the best interest of participants to allow the Plan to be charged more than three times this amount.  A prudent fiduciary would have negotiated an appropriate cap on recordkeeping fees consistent with the applicable market rate,

with any excess revenue sharing payments refunded to participants or used to defray other expenses that would have been borne by participants.

56.     These overpayments were not an anomaly. Defendant caused the Plan to pay similarly excessive recordkeeping expenses throughout the class period, resulting in millions of dollars in excessive fees during the class period. For example, in 2015, the Plan and another related plan,[27] with 10,646 participants combined, paid the Plan's recordkeeper over $2.3 million, or over $217 per participant.

57.     A prudent fiduciary would not have allowed the Plan to pay these excessive amounts for recordkeeping services year after year. As part of a prudent fiduciary process, fiduciaries will regularly monitor the amount of recordkeeping expenses that are being paid and will conduct periodic cost benchmarking to determine whether those amounts are consistent with the amounts paid by other similarly-sized plans. Further, prudent fiduciaries frequently submit requests for proposals (RFPs) to potential service providers every few years to obtain competitive information and survey possible alternatives. Based on the excessive amounts paid by the Plan for recordkeeping services, it is reasonable to infer that Defendant failed to take these measures (or took half-measures at best).

## III.    PLAINTIFF LACKED KNOWLEDGE OF DEFENDANT'S CONDUCT AND PRUDENT ALTERNATIVES.

58.     Plaintiff did not have knowledge of all material facts (including, among other

---

[27] The investments of the Plan at issue are held in a Master Trust along with those of the John Hancock Savings and Investment Plan (the "SIP Plan"). According to the SIP Plan's Form 5500, participants of it "consist of four groups within the Signator General Agency System -General Agents, Agents, Sales Supervisors, and Clerical Associates." The SIP Plan was closed to new participants as of January 1, 2015. As of year-end 2018, it had 1,143 active participants. The Master Trust holding the investments of the Plan and the SIP Plan files its own Form 5500, which reflects certain joint expenses of the Plan and the SIP Plan, including the recordkeeping expenses identified in this Paragraph.

things, the investment option and menu choices of fiduciaries of similar plans, the costs of the

Plan's investments compared to those in similarly-sized plans, the Plan's retention of proprietary

funds that were about to be liquidated, the availability of superior investment options, or the

costs of the Plan's administrative and recordkeeping services compared to similarly sized plans)

necessary to understand that Defendant breached its fiduciary duties and engaged in other

unlawful conduct in violation of ERISA, until shortly before this suit was filed.[28] Further,

Plaintiff did not have actual knowledge of the specifics of Defendant's decision-making

processes with respect to the Plan (including Defendant's processes for selecting, monitoring,

evaluating and removing Plan investments; and Defendant's processes for selecting and

monitoring the Plan's recordkeeper), because this information is solely within the possession of

Defendant prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable

inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

59.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to

bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by

29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this

statutory provision and Fed. R. Civ. P. 23.

60.     Plaintiff asserts her claims on behalf of a class of participants and beneficiaries of

the Plan defined as follows:[29]

> All participants and beneficiaries of the Incentive-Investment Plan for

---

[28] Plaintiff's counsel began an investigation of the Plan in 2019. Plaintiff did not review any of the documents cited in this Complaint or any of the information contained herein, including the studies, investment data, and Form 5500s cited herein, until after this investigation had begun.
[29] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

John Hancock Employees at any time on or after February 27, 2014, excluding any persons with responsibility for the Plan's investment or administrative functions.

61.    <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 9,000 to 10,000 participants at all relevant times during the applicable period.

62.    <u>Typicality</u>:   Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and suffered financial harm as a result of Defendant's mismanagement of the Plan. Defendant treated Plaintiff consistently with other Class members with regard to the Plan. Defendant's imprudent and disloyal decisions affected all Plan participants similarly.

63.    <u>Adequacy</u>:   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that they seek to represent, and Plaintiff has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede her ability to represent such Class members.

64.    <u>Commonality</u>:   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.   Whether John Hancock is a fiduciary with respect to the Plan;

   b.   Whether John Hancock breached its fiduciary duties by engaging in the conduct described herein;

   c.   The proper form of equitable and injunctive relief;

   d.   The proper measure of monetary relief.

65.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

66.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

67.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendant by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests

of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29  U.S.C. § 1104(a)(1)(A)–(B)

68.     As alleged above, Defendant is a  fiduciary with respect to the Plan and is subject to ERISA's fiduciary duties.

69.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendant in connection with its administration of the Plan and the selection and monitoring of Plan investments.

70.     Defendant breached these fiduciary duties by engaging in the conduct described herein.  Among other things, Defendant failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's investment options, by improperly prioritizing John Hancock's proprietary investments over superior available options, and by failing to critically or objectively evaluate the cost and performance of the Plan's proprietary investments in comparison to other investment options. In addition, Defendant caused the Plan to pay excessive recordkeeping fees, and failed to properly monitor and control those expenses.

71.     Instead of acting in the best interest of Plan participants, Defendant's conduct and decisions were driven by its desire to drive revenues and profits to John Hancock and to generally promote John Hancock's business interests. Accordingly, Defendant failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of its fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

72.    Further, each of the actions and omissions described in paragraph 70 above and elsewhere in this Complaint demonstrate that Defendant failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

73.    As a consequence of Defendant's fiduciary breaches, the Plan and its participants suffered millions of dollars in losses.

74.    Defendant is liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendant made through the use of Plan assets, and to restore to the Plan any profits resulting from its fiduciary breaches.  In addition, Defendant is liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff as a representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A declaration that Defendant breached its fiduciary duties under ERISA;

D.    An order compelling Defendant to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

26

E.      An accounting for profits earned by Defendant and a subsequent order requiring it to disgorge all profits received from, or in respect of, the Plan;

F.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendant including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Defendant as a result of Defendant's unlawful conduct in violation of ERISA or a surcharge against Defendant to prevent unjust enrichment from unlawful conduct involving the Plan;

G.      An order enjoining Defendant from any further violations of ERISA;

H.      Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.      An award of pre-judgment interest;

J.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.      An award of such other and further relief as the Court deems equitable and just.

Dated: February 27, 2020

**BLOCK & LEVITON LLP**

By: /s/ Jason M. Leviton
Jason M. Leviton (BBO #678331)
BLOCK & LEVITON LLP
260 Franklin Street, Ste. 1860
Boston, Massachusetts 02110
(617) 398-5600
jason@blockesq.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 022084X*
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Jacob T. Schutz, MN Bar No. 0395648*
        *pro hac vice applications forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200

27

Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
jschutz@nka.com